UNITED STATES FIDELITY & GUARANTY COMPANY, etc., et al., Plaintiffs, ·

v.

ORLANDO UTILITIES COMMISSION, et al., Defendants.

No. 75–51–Orl–Civ–Y.

United States District Court, M.D. Florida, Orlando Division.

Feb. 4, 1983.

place of business in the State of Maryland. U.S.F. & G. has sued the defendants Orlando Utilities Commission (O.U.C.), The City of Orlando (City), Black & Veatch Consulting Engineers (B & V) and F.C. Wallace (Wallace) for breach of contract, negligence, quantum meruit and breach of fiduciary obligation to a surety. Blount Brothers Corporation (Blount) is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in the State of Alabama. Blount seeks recovery against O.U.C., the City, B & V, and Wallace for breach of contract, negligence and quantum meruit. Both plaintiffs seek punitive damages against O.U.C.

O.U.C. is a municipal utility created by special act of the Florida Legislature in 1923 as "part of the government of" the defendant City. O.U.C. generates electricity and sells it to customers both in and outside the city limits of the City of Orlando and in addition, by interchange agreements sells electricity to other utility companies, both private and public, throughout the State of Florida.

The City of Orlando is a municipality created by act of the Florida Legislature. B & V is a partnership organized and existing under the laws of the State of Missouri with its principal place of business in the State of Missouri. None of the partners are residents of either Maryland or Alabama.

Wallace is a citizen of the State of Kansas and a partner in B & V.

O.U.C. and the City have counterclaimed against U.S.F. & G. for damages allegedly resulting to O.U.C. and the City for alleged breach of contract and negligence on the part of U.S.F. & G. and its agents or employees and its principals Homer Knost and Lurgi-Knost.

The portion of the case which is now before the Court for decision is the counterclaim against U.S.F. & G. This case is being tried to the Court without a jury and because of the complexity of the issues and the necessity for extended periods for the taking of evidence, the trial has been bifur-

Brian C. Sanders, Orlando, Fla., for plaintiffs.

Leon H. Handley, Jon M. Wilson, Lawrence M. Watson, Jr., Orlando, Fla., Courtney Stanton, Jacksonville, Fla., John Edwin Fisher, Orlando, Fla., Judson Freeman, Jacksonville, Fla., Harlan Tuck, Orlando, Fla., for defendants.

## MEMORANDUM OPINION

GEORGE C. YOUNG, Senior District Judge.

This case is before the Court for a decision as to only a portion of the issues which have been raised by the pleadings. Before delineating the issues now ripe for decision, it is necessary to set forth briefly the background.

Jurisdiction of this Court is based on diversity of citizenship. The plaintiff United States Fidelity & Guaranty Company (U.S.F. & G.) is a Maryland corporation doing business in Florida, with its principal

cated so as to try and decide seriatim various issues. Previously heard and decided was the issue as to whether B & V was, as to the matters material to this case, acting as the agent of O.U.C. This Court after hearing the evidence and the arguments of counsel decided, and so ruled, that B & V was, in all matters material to the issues involved in this case, acting as the agent of O.U.C.

Also the Court concluded that U.S.F. & G. had completed the contract which has given rise to this controversy so as to be entitled to full payment of the contract price subject only to damages, if any, which O.U.C. and the City might be entitled to recover from U.S.F. & G. on the counterclaim.

As a part of its productive facilities for the generation of electricity, O.U.C. has and does operate a steam generating plant in Brevard County, Florida known as its "Indian River Plant". In 1969 O.U.C. elected to construct a third unit to the plant for the purpose of generating 317 megawatts. This new unit was and is identified hereinafter as IR3 (Indian River # 3).

B & V had for many years been the consulting engineer for O.U.C. and in connection with IR3 was specifically engaged to provide field engineering services for the construction of that unit. Individual contracts for the various phases and components of the construction were let by O.U.C. through the services of B & V. Although there was no prime contractor, B & V, for all practical purposes, was delegated by O.U.C. the authority and the obligations to coordinate the work of the various individual contractors which authority and obligations would ordinarily be performed by a prime contractor.

The Auchter Company (Auchter) is a general contractor and was given the contract for the structural steel work in IR3. Aetna Steel Company (Aetna) was the vendor of the structural steel which Auchter had contracted to erect. General Electric Company (G.E.) was the vendor of the turbine generator and in addition, by separate contract, was to erect the turbine generator; further G.E. supplied various items of electrical equipment. Combustion Engineering Company (C.E.) was the vendor of the boiler and in addition, by contract agreed to erect the boiler for a cost-plus-fixed-fee.

E.C. Ernst, Inc. (Ernst) was the electrical contractor for the installation of owner furnished equipment and wiring circuitry equipment throughout IR3.

On July 13, 1971 O.U.C. entered into a contract with Homer Knost for the mechanical construction portion of IR3. This contract was identified and is hereinafter referred to as ME–30A. U.S.F. & G. became the surety for Homer Knost on a payment and performance bond for the work to be performed by Homer Knost on the ME–30A contract. The obligations under the contract were on April 15, 1972 transferred to and assumed by Lurgi-Knost which was the successor corporation to Homer Knost. This transfer of obligations was agreed to by O.U.C.; U.S.F. & G. executed another payment and performance bond containing the same provisions as its first bond except that Lurgi-Knost was named as the principal.

The ME–30A contract was essentially for the installation of all piping, instrumentation and insulation with the contractor furnishing some of the materials and equipment to be installed and some to be furnished by the owner (O.U.C.). Homer Knost subcontracted the instrumentation work to Southern Instrumentation Company (SICO) and further subcontracted the insulation work required by the ME–30A contract to Anco, Inc. (Anco).

In February 1973 Lurgi encountered such financial problems that it was unable to continue on the job. U.S.F. & G. (because as Lurgi's surety it was required to assure performance of the ME–30A contract) contracted with Blount to complete the obligations of Lurgi.

The crux of the counterclaim is that the ME–30A contract provided for "commercial operation" of IR3 on June 1, 1973, but that because of the alleged failure of the ME–30A contractor to complete its work in a

timely fashion, IR3 was not in commercial operation until February 1, 1974, eight months after the target date specified in the contract.

U.S.F. & G. raises a number of contentions as to why O.U.C. and the City should be precluded from pursuing their counterclaim. First of all, it is contended that O.U.C. is estopped from claiming damages against U.S.F. & G. because O.U.C. allegedly failed to timely notify U.S.F. & G. of Lurgi's delays in the completion of its work. General Condition 26 of the ME–30A contract provides:

" . . . If at any time the Engineer certifies in writing to the Owners that . . . the Contractor is violating any of the conditions of this contract . . . then the Owners may serve written notice upon the Contractor and his surety of the Owners intention to terminate this contract. Unless within five (5) days after the serving of such notice, a satisfactory arrangement is made for continuance, this contract shall terminate. In the event of such termination, the surety shall have the right to take over and complete the work . . . ."

On November 29, 1972 Wallace for B & V sent a letter to Lurgi expressing concern about Lurgi's ability to maintain job progress and stating:

" . . . We request that a meeting be held here in Orlando for the purpose of discussing the procedures for contract termination if such action proves to be necessary. We request such a meeting in the near future."

U.S.F. & G. complains that it was not notified of O.U.C.'s concern, nor was it furnished a copy of the aforementioned letter. Furthermore, U.S.F. & G. was not advised of any default by Lurgi until February 27, 1973, when Lurgi itself notified the surety of its financial difficulties and inability to carry on. So U.S.F. & G. contends that to the extent O.U.C. prevented U.S.F. & G. by lack of timely notice from protecting its equitable interest in the contract balances, U.S.F. & G. is released by O.U.C. for delays existing prior to March 12, 1973 (the date

that Blount came on the job to complete the ME–30A contract pursuant to agreement with U.S.F. & G.).

▮ While, with the benefit of hindsight, it would have been the better course for O.U.C. to advise U.S.F. & G. of its dissatisfaction with Lurgi's lack of progress, nevertheless, this failure of notification has not been shown to have prejudiced U.S.F. & G.; there is no showing that an earlier notice would have materially altered the progress of the work to be performed by the ME–30A contractor, whether it had continued to be Lurgi or its successor Blount. But more importantly the November 29, 1972 letter was not the five day notice contemplated by General Condition 26. It was merely a preliminary letter which might or might not have resulted in the type of notice contemplated by General Condition 26 which latter notice would and should have been given to a surety.

Therefore, this Court holds that O.U.C. did not release U.S.F. & G. for delays arising prior to March 12, 1973 because of the failure of O.U.C. to advise U.S.F. & G. of its dissatisfaction with Lurgi.

▮ Next, U.S.F. & G. contends that O.U.C. is estopped from claiming damages from U.S.F. & G. because during the course of the construction of IR3, O.U.C., through B & V, issued a new schedule of milestone dates for completion of the various portions of the work. This new schedule contemplated that IR3 would be commercial October 1, 1973. In the opinion of this Court the rescheduling was not a waiver of any legitimate claim it might have for delay to such date, but was a necessary step in view of the fact that the construction progress was behind schedule and a new schedule was required. There is no evidence that by such rescheduling the O.U.C. or B & V intended to waive any claims or that it should be estopped as a result of such action. Therefore, this Court holds that O.U.C. is not estopped by virtue of its rescheduling the job in June 1973.

▮ U.S.F. & G. also contends that O.U.C. released U.S.F. & G. from any and

all claims arising out of the work from the mechanical contract by virtue of a release O.U.C. executed on September 4, 1974, which ran to Stuart Painting Company, Inc., Blount Brothers Corporation, and Insurance Company of North America. This release however (consideration of which was $12,870.) was obviously intended only to cover the claim of Stuart Painting Company and nothing more.

Furthermore, if it were to act as a release of all claims against the parties in whose favor the release ran (Stuart Painting Company, Inc., Blount Brothers Corporation, and Insurance Company of North America) it would not operate to release U.S.F. & G. which was not a named party in the release. The contention that U.S.F. & G. would be the beneficiary of such a release because Blount was performing work for it in the completion of the ME–30A contract is in the opinion of this Court without merit.

█ U.S.F. & G. also claims that around June 1, 1973, O.U.C., through B & V, issued a number of extra work orders to U.S.F. & G. which precluded completion of the contract by June 1, 1973 and that therefore no damages for delay could arise until after the completion by Blount (for U.S.F. & G.) of these extra work orders. The position of U.S.F. & G. seems to be that regardless of any prior delays for which it might be responsible, that the issuance of the extra work orders in June 1973 "wiped the slate clean" and therefore exonerated U.S.F. & G. from any liability for delays for which it might otherwise be responsible occurring prior to the issuance of the work orders. In support of this contention U.S.F. & G. cites the case of *Ramsay and Gatlin Construction Company v. Vincennes Bridge Company,* 50 F.2d 600 (6th Cir.1931) in which that court said at page 601:

"The general rule undoubtedly is, that where the contract provides that the contractor shall pay the owner a penalty for delay beyond the agreed time, and the subcontractor agrees with the contractor to indemnify him against such a penalty, so far as caused by the subcontractor's default, and delay is caused by the owner's requirement of extra work, there is no liability against contractor or subcontractor for the delay penalty so resulting."

This Court construes the above-quoted law as standing for the proposition that a contractor cannot be assessed for delay damages caused by extra work required of the contractor by the owner. It does not stand for the proposition that delay caused by the contractor prior to the issuance of any requests for extra work cannot be the basis for damages to be assessed against the contractor. Applying that interpretation to the facts of this case, U.S.F. & G. cannot be liable for any damages resulting from delays caused by owner-required extras but, on the other hand, U.S.F. & G. can be liable for any damages caused by delays for which it is responsible and which were not the result of owner-required extras.

Because of the conclusions that this Court has reached as hereinafter set forth concerning the allocation of responsibility for the delay of eight months, a discussion concerning delays caused by extras will be deferred until later in this opinion.

U.S.F. & G. contends that O.U.C. deliberately delayed the date upon which IR3 was declared commercial. General Condition 2–9 of the ME–30A contract provides:

" 'Commercial operation' shall mean the condition of operation in which the complete steam-electric generating unit with all sub-systems and supporting equipment is available for continuous operation at various loads up to and including rated capacity without abnormal operating limitations. The date of beginning of commercial operation shall be fixed solely by a formal written statement signed by an official representative of the Owner and made a part of the official records of the Owner."

In November 1971 O.U.C. had entered into a contract with Florida Power Company (FPC) for a certain portion of the output of IR3 as of June 1, 1973 or the commercial operation date of IR3, whichever was later. By the fall of 1973 the Arab Oil Embargo had greatly increased the price of oil so that

the November 1971 contract contained a pricing formula which would have been most disadvantageous to O.U.C. If O.U.C. had declared the plant commercial prior to January 30, 1974 it would have had to sell power to FPC at a price lower than the cost of production. On January 30, 1974 O.U.C. entered into a contract with FPC which increased the price of power which O.U.C. would furnish to FPC from IR3.

Thereafter, O.U.C. declared the plant commercial as of February 1, 1974 even though on that date IR3 was completely shut down. It is noteworthy that prior to January 30, 1974, IR3 was utilized to provide current from the Indian River Plant when IR2, a 200 megawatt unit, was out of service for several weeks.

Furthermore, there were increasing sales of power from IR3 in November and December, 1973 and January 1974. In mid-December 1973 O.U.C. acquired oil from FPC and in return provided power to FPC from IR3. The power provided in those three months was under a short-term commitment which permitted renegotiation of prices, whereas the long-term interchange did not permit such renegotiation. It is also noteworthy that the Florida Operations Commission (composed of representatives from the various power companies) issued reports which indicated that IR3 would be commercial in December 1973.

Furthermore, reports filed by O.U.C. with the Federal Power Commission indicated the same. CE's November 19, 1973 status report indicated that IR3 could be declared commercial following a six-day check of screens commencing November 28, 1973. G.E. turned its generator over to O.U.C. on December 3, 1973.

While there is not direct evidence that O.U.C. deliberately delayed the IR3 going commercial, the circumstantial evidence clearly leads to the conclusion that IR3 could just as well have been declared commercial on December 3, 1973 as on February 1, 1974. The major differences in the circumstances existing as to each of those dates were that on December 3, 1973 it would have been to the economic detriment of O.U.C. for IR3 to have been declared commercial, and there was still some—but primarily extra—work being performed by the ME–30A contractor in the intervening period. As previously noted, the ME–30A contractor cannot be held responsible for the time utilized in performing Owner required extras even if such work was done after the expected completion date of the contract.

O.U.C. contends that many of the time consuming extras were to repair or correct defects which, if the mechanical contractor had been on time, would have been discovered in Owner furnished equipment prior to June 1, 1973, and could have been remedies in time for a commercial operation on that date; hence, O.U.C. contends the period of time utilized by the mechanical contractor to perform such extras after June 1, 1973 should be chargeable to U.S.F. & G. O.U.C. has the burden of proof on this issue but has failed to establish it by a preponderance of the evidence. Therefore, the time utilized by Blount between December 3, 1973 and February 1, 1974 in performing Owner required extras will not be chargeable against U.S.F. & G.

It is true that some insulation work was being completed in the December-January period, but consideration of all the evidence pertaining to those two months causes this Court to conclude that such work was not the causal factor in delaying the commercial date to February 1, 1974; rather, the failure of certain equipment for which U.S.F. & G. was not responsible, the completion of extras and the economic self interest of O.U.C. were the primary reasons for the delay of the declaration of the commercial date from December 3, 1973 to February 1, 1974.

In view of the foregoing, U.S.F. & G. cannot be held to be responsible for the two months delay of December 1973 and January 1974.

A determination of the responsibility for causing the delay of the other six months (June through November 1973) is much more difficult because the evidence is conflicting and confusing. O.U.C. has present-

ed evidence, primarily that of F.C. Wallace, establishing the fact that as to most of the work which the mechanical contractor was required to perform it was behind schedule, both as to commencement and completion. The evidence clearly established that fact. However, that finding does not dispose of the issue. U.S.F. & G. points out that the testimony and charts prepared by Wallace concerning the tardy work of the ME–30A contractor failed to reflect interfaces with the work of other contractors, particularly as they related to each other on the critical path for completion.

The critical path is the longest series of the work activities through the performance of a whole project. If an activity on the critical path exceeds its scheduled duration, the termination of the project will be delayed unless some other activity on the critical path is performed in less than its scheduled time. A work activity not on the critical path may be completed later than its scheduled time without affecting the termination of the project unless the non-critical activity exceeds its "float" and thereby becomes an activity on the critical path.

So in this case unless the activities of the mechanical contractor were on the critical path, or any float was exceeded, delays would not have been instrumental in delaying the end date of the contract. U.S.F. & G. has presented evidence, primarily in the form of testimony from David Lee and charts prepared by him, seeking to establish that there were controlling delays during the performance of the construction of IR3 which were not the fault of the ME–30A contractor. U.S.F. & G. contends that scheduling omissions of the interface upon the work of the boiler erector and the mechanical contractor pertaining to the date of the boiler hydrostatic test and the air test of the boiler furnace, the late raising and alignment of the boiler drum, the late delivery of the high pressure rotor for the turbine, CE's necessary corrective work on the boiler nozzles, the extended EHC turbine flush, the extended turbine control checkout period, the defective Owner furnished circulating water pipes and pumps and problems with the boiler start-up steam generator, among others, were the controlling factors causing delays in excess of six months from the June 1, 1973 target date.

On the other hand, O.U.C. has offered specific evidence concerning the delays allegedly attributable to U.S.F. & G.'s principal due to the delivery of ME–30A furnished pipe which turned out to be defective. This piping was required by the contract to be furnished by Lurgi-Knost and was to conform to the 1967 Power Piping Code provisions which were in effect at the time the bids were taken. This pressure piping was to have been fabricated by Belmas Industries but, with the permission of B & V, Lurgi-Knost substituted North American Steel Company (NASCO) as the fabricator of this piping. The first load of NASCO pipe arrived on the job site on February 25, 1972 and the second shipment arrived four days later and was rejected by the ME–30A contractor as not being in compliance with the specifications.

Thereafter, additional piping was received from NASCO and on June 5, 1972, as a result of a discovery of a lack of fusion and an incomplete penetration in a weld B & V began detailed visual and X-ray inspections of other welds.

Lurgi-Knost had all of the piping shipped to Houston, Texas for X-ray and repair of all defective welds by Texas Pipe Vending Company. This procedure proved costly both in time and in money to Lurgi-Knost. The evidence was that it cost more for the shipment to Texas and the repair of the defective welds than it would have cost to buy new piping; however, this procedure was apparently followed by Lurgi-Knost in hopes that it would properly document a claim against NASCO.

It was expensive in loss of time as evidenced by the fact that Lurgi-Knost sought an extension of time of 168 days as a result of the NASCO pipe problem. This request was rejected by B & V.

U.S.F. & G. contends that O.U.C. is responsible for the delays caused by the NASCO piping for two reasons. First, it is

contended that B & V was negligent in failing to reject the piping before June 1972 when the first shipment arrived on February 25, 1972. Secondly, it is contended that because the specifications drawn by B & V only required visual inspection of the pipe welds that neither the fabricator nor the ME–30A contractor should be responsible for defects discoverable by X-ray.

O.U.C. counters that the piping code required the pipe welds to be free of the defects which were discovered regardless of the method used for discovery and regardless of the fact that the specifications did not specifically call for X-ray examination. This Court concludes that it is not necessary to resolve this particular dispute as to whether the welds should have been subject to X-ray examination or not because there is sufficient evidence to conclude that the defects were ascertainable by visual examination and therefore were rejectable as in non-compliance with the specifications regardless of the method of detection used.

The delay of B & V in detecting the defects and rejecting the piping should not and does not excuse the mechanical contractor of its obligation to furnish and install defective-free piping. Consequently, the responsibility for the defects in the welds of the NASCO fabricated piping and the delays which resulted therefrom is the responsibility of the mechanical contractor.

However, the fact that the ME–30A contractor was responsible for a period of delay resulting from the defective NASCO pipe does not necessarily mean that such delay was the cause of the delay in the commercial operation of IR3. Unless the piping delay was on the critical path or, if not, exceeded the "float" as a non-critical activity it would not have been a factor in the tardy commercial date.

David Lee (U.S.F. & G.'s expert) testified and presented Plaintiff Exhibits 4695 and 4704 to the effect that B & V's schedule of activities with planned commercial operation date of June 1, 1973 was in error by 75 days by omitting 49 days for main steam hydro restraint and 26 days for boiler air-

test. This would have moved the commercial operation date to August 15, 1973.

Lee, by testimony and Plaintiff's Exhibits 4696 and 4705, contended that the late boiler drum raising and aligning had a net impact of pushing the commercial operation date back another 5 days to August 20, 1973.

Further testimony by Lee and Plaintiff's Exhibit 4697 claim that the late delivery of the high pressure rotor resulted in another net impact delay of 37 days thereby adjusting the earliest commercial operation date to September 26, 1973. General Electric supplied the turbine which had a high pressure center built to rotate 3600 times per minute. A number of tests were run on the rotor which failed the last heat lathe test. The rotor was to have been delivered in June 1972 but because General Electric had to have a steel mill manufacture a new one, it was not delivered until January 29, 1973. General Electric had a contract directly with O.U.C. and the ME–30A contractor was not responsible for the rotor delivery delay.

Lee and U.S.F. & G. Exhibits 4698 and 4706 postulate that another 23 days net delay resulted from boiler nozzle and related problems (due to no fault of the ME–30A contractor) pushing back the commercial operation date to October 19, 1973.

Testimony by Lee and U.S.F. & G. Exhibits 4699, 4700 and 4707 claim further net delays of 25 days for the extended electro-hydraulic control and 19 days for extended turbine controls check-out period having the effect of pushing the commercial operation date to December 2, 1973.

Lee concluded—supported by U.S.F. & G. Exhibits 4701, 4702, 4708 and 4712—that additional net delays of 44 days were caused by defective owner furnished circulating water pipes and pumps and 61 days by boiler start-up delays resulting in a final commercial operation date of February 1, 1974.

Each of the delays testified to by Lee were contended by him to be "controlling". He was unable to give an opinion as to

what effect the mechanical contractor's delays would have had on the completion date if the delays by the other contractors had not occurred. While this Court attaches much weight to Lee's analysis, it is not accepted in full. For one thing, according to Lee, the controlling delays precluded completion prior to February 1, 1974 but as this Court has already found, the plant was able to (and did) operate December 1, 1973.[1]

Wallace, on behalf of B & V and O.U.C. contended that all but one month of the eight month delay (from June 1, 1973 to February 2, 1974) was due to the fault of the mechanical contractor. He supported this opinion with exhibits showing the late completion dates of the thirty pipe systems for which the mechanical contractor was responsible.

However, Wallace failed to interface these delays with the delays of other contractors so as to establish that the controlling delay was that of the ME–30A contractor. (In this regard, if B & V had utilized throughout the construction up-to-date CPMs either this law suit would have been avoided or would have been easier of resolution by settlement or decision.)

John Gassman was B & V's project manager and he testified that the NASCO pipe rejection problem put Lurgi-Knost two to three months behind, that the transition from Lurgi to Blount did not cause any appreciable delay and that Blount did not do anything which caused an extension of the commercial operation date from October 1, 1973 to February 1, 1974.

There is no doubt that the mechanical contractor was behind schedule and that this resulted in delaying other contractors so as to contribute to the ultimate delay in commercial operation. There is also no doubt that the other contractors employed by O.U.C. were behind schedule on items and work due to no fault of the mechanical contractor. Apportionment of the delay responsibility has been the most difficult of the issues involved in this case.

 I find that in consideration of all of the evidence (far too voluminous to detail here but *fully* considered) that O.U.C. has established to a reasonable certainty that the mechanical contractor was responsible only for delays prior to October 1, 1973, which delays resulted in delaying the commercial operation date by ninety days. Responsibility for the remainder of the delays was that of other contractors and defective owner supplied items.

1. David Lee was of the opinion IR3 could have been in commercial operation on gas on December 17, 1973 but not on oil until February 5, 1974 because an oil gun had to be replaced.

The ME–30A contractor was not responsible for the oil gun. Specification for IR3 provided for natural gas to be the primary fuel with oil to be the secondary fuel.